KAILEIGH N. BRUSARD & another[1] vs. TERENCE J. O'TOOLE.

Plymouth. March 1, 1999. - May 20, 1999.

Present: WILKINS, C.J., ABRAMS, LYNCH, GREANEY, FRIED, MARSHALL, & IRELAND, JJ.

*Negligence*, Medical malpractice. *Evidence*, Learned treatise. *Medical Malpractice*, Expert opinion.

A party seeking to introduce, in the course of litigation, a statement in an authored treatise (as distinguished from an edited compendium, journal, or periodical), for the purpose of cross-examination under Proposed Mass. R. Evid. 803 (18), must establish that the treatise, not the statement itself, is a reliable authority. [601-604]

In a medical malpractice action, the judge's exclusion of a portion of a chart in a medical treatise for the purposes of the plaintiff's cross-examination of the defendant's expert witness was error [604-605], and the judge's exclusion of the chart from evidence on the grounds that the writer of the chart was not the author of the treatise and that the plaintiff had failed to lay a proper foundation regarding the writer of the chart was also error [605-606]: where the information contained in the chart was relevant to the opinion of the defense experts, the errors were prejudicial to the plaintiff and a new trial was required [607-608].

CIVIL ACTION commenced in the Superior Court Department on December 2, 1992.

The case was tried before *John A. Tierney*, J.

After review by the Appeals Court, the Supreme Judicial Court granted leave to obtain further appellate review.

*Kenneth A. Cohen* for the defendant.

*Paul F. Kenney* (*J. Michael Conley* with him) for the plaintiffs.

MARSHALL, J. Kelly L. Brusard (Brusard) brought this medical malpractice action on behalf of herself and her now nine year old daughter, Kaileigh, against obstetrician Terence J. O'Toole alleging that Dr. O'Toole's malpractice resulted in severe neurological brain injury to Kaileigh. At issue on appeal is an evidentiary ruling by the trial judge excluding from evidence a

[1] Kelly L. Brusard, individually, and as mother and next friend.

chart contained in a medical treatise, but prepared by someone other than the author of the treatise.

Brusard commenced her action in December, 1992. In November, 1995, after a seven-day jury trial, the jury returned a verdict in favor of Dr. O'Toole. The judge denied Brusard's motion for a new trial. She took an appeal from the judgment and the denial of the motion for a new trial claiming error (1) in the judge's exclusion of the medical chart for the purpose of cross-examining defense expert witnesses pursuant to Proposed Mass. R. Evid. 803 (18), adopted by *Commonwealth* v. *Sneed,* 413 Mass. 387, 396 (1992); and (2) in his refusal to admit the chart under G. L. c. 233, § 79C. Brusard also alleged error in the judge's exclusion of Brockton Hospital's written policies and procedures in effect at the time of Kaileigh's birth. The Appeals Court reversed the judgment and ordered a new trial, concluding that it was error to exclude the medical treatise evidence for the purpose of cross-examining defense witnesses. *Brusard* v. *O'Toole,* 45 Mass. App. Ct. 288, 290-294 (1998). We granted Dr. O'Toole's application for further appellate review. We vacate the judgment and remand this case to the Superior Court for a new trial.

I

Brusard became a patient of Dr. O'Toole's approximately ten weeks into this, her first, pregnancy. Dr. O'Toole treated her throughout the course of her pregnancy. Brusard was twenty-one years old at the time, and her pregnancy was uneventful prior to her delivery. Her estimated date for delivery was April 13, 1990. On April 18, 1990, because Brusard was one week past her estimated due date, Dr. O'Toole ordered an oxytocin challenge test to assess the well-being of the fetus.[2] The results were normal. On April 23, 1990, when Brusard still had not delivered her baby, Dr. O'Toole ordered a second oxytocin challenge test. The results again were normal. A biophysical profile,

[2]Dr. O'Toole testified that it is not unusual for a first-time mother to go beyond her estimated delivery date. However, over time the placenta, which provides oxygen and nutrients to the fetus, deteriorates, having an adverse impact on the health of the fetus. An oxytocin challenge test induces contractions in the mother and evaluates the response of the fetal heart in response to these contractions. An acceleration of the fetal heartbeat to the stress of the contractions reassures the physician that the fetus is doing well despite the fact that the estimated due date has passed.

another test to assess the health of the fetus, was performed the following day at approximately 11 A.M.[3] The biophysical profile indicated a "flunking" score of two out of a possible eight, and showed that the fetus had a "[l]ack of movement, lack of breathing effort and lack of tone." The amniotic fluid level was normal. Brusard was admitted to Brockton Hospital at 12:10 P.M., in active labor. The electronic monitoring of the fetus commenced by the nursing staff indicated minimal fetal activity.

When Brusard was admitted, Dr. O'Toole was seeing patients at another facility and did not arrive at Brockton Hospital until 2:10 P.M. He determined then that Brusard was "in quite active labor" and "decided to watch her closely as long as she was in labor to see what happened." The record indicates that Dr. O'Toole was not on site at the hospital from approximately 2:45 P.M. until 7:30 P.M. At 5:34 P.M., the fetal heart rate dropped precipitously for several minutes. The labor nurse called Dr. O'Toole, who ordered preparation of Brusard for a caesarian section. Brusard's labor progressed normally during this period of time, and the caesarian section was not performed after the fetal heart rate rebounded.

Dr. O'Toole next examined Brusard at 7:30 P.M. At 8:45 P.M., he concluded that Brusard's labor had failed to progress and that a caesarian section was necessary. He delivered Kaileigh by caesarian section at 9:45 P.M. Kaileigh required resuscitation and intubation, and was unable to breathe on her own for five minutes after her birth. She was transferred to Boston Children's Hospital where she was treated for birth asphyxia (oxygen deprivation). From birth, Kaileigh has suffered from a serious seizure disorder, behavior problems with attention deficit-hyperactivity disorder, speech difficulties, and motor coordination difficulties of both upper and lower extremities which will "persist for the remainder of her normal life expectancy."

Brusard's theory at trial was that the poor score on the biophysical profile indicated that the fetus was suffering from asphyxia, mandating immediate delivery. Through the expert testimony of an obstetrician-gynecologist and a pediatric

---

[3]The biophysical profile consists of an oxytocin challenge test and an ultrasound portion. On April 23, 1990, Dr. O'Toole had ordered that the two be performed together. The ultrasound portion was not performed until April 24, apparently because of scheduling difficulties. To remain consistent with the terminology used by the parties and by the Appeals Court, we refer in this opinion to the ultrasound portion as the "biophysical profile."

neurologist, she sought to establish that the fetus had suffered a major insult at some point after the second oxytocin challenge test showed normal results. Her expert pediatric neurologist testified that, in his opinion, Kaileigh had suffered three strokes as a result of blood clots blocking arteries in her brain, one of which occurred at 5:34 P.M. when the fetal heart rate dropped so dramatically, and that a lack of oxygen in the brain, a drop in the fetal blood pressure, and blood clots that formed in the brain caused the strokes. In his opinion, "the bulk of the damage to this brain occurred in the last ten hours of [Ms. Brusard]'s labor and particularly in the last six hours of the labor," i.e., *after* the biophysical profile was performed. He opined that, by waiting until 9:45 P.M. to deliver Kaileigh, Dr. O'Toole's treatment fell below the accepted standards of care and caused Kaileigh's brain injury.

Dr. O'Toole proffered an alternative theory. Through the expert testimony of an obstetrician-gynecologist, pathologist, and pediatric neurologist, he sought to establish that the stroke that caused Kaileigh's brain injury had occurred prior to the time of the biophysical profile, and that the low profile score reflected the stroke, not fetal asphyxia. His theory was that multiple emboli,[4] blood clots that originated in the umbilical cord, traveled through Kaileigh's body and ultimately lodged in the arteries of her brain, causing the stroke. His expert pediatric neurologist testified that, based on the positive results of the second oxytocin challenge test and the poor results of the biophysical profile, it was his opinion that the stroke had occurred between the two tests, that is before the biophysical profile was performed. He opined that Kaileigh's outcome would have been no different had she been delivered immediately after Dr. O'Toole obtained the results of the biophysical profile.

II

The critical points of contention were whether fetal asphyxia had caused Kaileigh's stroke (or strokes) and resulting brain

[4]The blood clots that each party theorizes caused Kaileigh's stroke or strokes differ. Brusard's expert testified that the clots were thrombi, which are clots attached to the arteries in the brain. The defendant maintained that the clots were emboli, clots that travel from one part of the body to another, that originated in the umbilical cord, traveled through Kaileigh's body, and ultimately blocked the arteries in her brain.

injury, whether the biophysical profile score indicated fetal asphyxia, and whether Dr. O'Toole should have delivered Kaileigh immediately upon learning the results of the biophysical profile. Brusard sought to introduce in evidence a chart on biophysical profiles taken from the 1993 edition of a medical text, Williams, Obstetrics (19th ed. 1993). The chart contains three columns: one entitled "Biophysical Profile Score," the second entitled "Interpretation," and the third entitled "Recommended Management." According to the chart, a biophysical profile score of "0-2" (column one), the range in which Kaileigh's score fell, corresponds to an interpretation of "Almost certain fetal asphyxia" (column two) and a recommended management of "Deliver" (column three). The chart was authored by and credited in the Williams text to "Manning and colleagues (1987), with permission." The judge excluded the entire chart from admission in evidence under G. L. c. 233, § 79C. Relying on Proposed Mass. R. Evid. 803 (18), the judge allowed Brusard to cross-examine certain defense witnesses with the information contained in columns one and three only.

A

Proposed Mass. R. Evid. 803 (18), which we adopted in *Commonwealth* v. *Sneed*, 413 Mass. 387, 396 (1992), provides in relevant part:

"The following are not excluded by the hearsay rule, even though the declarant is available as a witness: . . .

"(18) Learned Treatises. To the extent called to the attention of an expert witness upon cross-examination, statements contained in published treatises, periodicals, or pamphlets on a subject of history, medicine, or other science or art, established as a reliable authority by the testimony or admission of the witness or by other expert · testimony or by judicial notice. If admitted, the statements may be read into evidence but may not be received as exhibits."[5]

The question is whether the language "established as a reliable

---

[5] The comments of the Advisory Committee to Study the Rules of Evidence (July, 1980) on Proposed Mass. R. Evid. 803 (18) noted that "[t]his provision is similar to the federal rule, with the exception that the language 'or relied upon by him in direct examination' [appearing after the word 'cross-

authority" modifies "statement" (here, the chart), as Dr. O'Toole argues, or "treatise," as Brusard contends. Under the rule, an opponent of the expert witness seeking to use a statement of another incorporated in a treatise must establish that the treatise itself, and not the statement (or chart) contained therein, is "a reliable authority."

When we adopted proposed rule 803 (18) in *Commonwealth v. Sneed, supra* at 396, we stated:

> "Proposed rule 803 (18) requires that an opponent of the expert witness bring to the witness's attention a specific statement in a *treatise that has been established, to the judge's satisfaction, as a reliable authority.* The witness should be given a fair opportunity to assess the statement in context and to comment on it, either during cross-examination or on redirect examination. The judge, of course, will have to determine the relevance and materiality of the statement and should consider carefully any claimed unfairness or confusion that admission of the statement may create." (Emphasis added.)

We also said:

> "We see potential benefit, and little risk of harm, in adopting the proposed Massachusetts rule of evidence, which permits a party challenging an expert's opinion to interrogate that expert about a relevant, divergent opinion expressed *in a reputable book.* See *Reilly* v. *Pinkus,* 338 U.S. 269, 275 (1949). Admission in evidence of a statement *from a treatise of the kind referred to in proposed rule 803 (18), whose authenticity and reliability are shown,* which was not written for use in litigation, and which expresses an expert opinion on a subject relevant to the case on trial, will tend to enhance, rather than detract from, the truth-finding function" (emphasis added).

*Id.* We think it a logical reading of the language both of the rule and of our decision in that case, that the rule contemplates that an authored treatise, and not the statements contained therein,

examination' in the. introductory phrase] in the federal rule is stricken. The result [of the change from the Federal rule] is to make treatises unavailable to bolster direct examination." See *Commonwealth* v. *Sneed,* 413 Mass. 387, 395 n.6 (1992).

must be established as a reliable authority. See W.G. Young, J.R. Pollets, & C. Poreda, Evidence § 803.18, at 188 (1998) ("party seeking to admit the learned treatise [on cross-examination] must first lay a foundation that the treatise is a reliable authority").

The defendant relies on cases addressing the admissibility of articles published in journals under the cognate Fed. R. Evid. 803 (18) to support his contention that a plaintiff must establish the chart, and not the treatise, as reliable authority. *Twin City Fire Ins. Co.* v. *Country Mut. Ins. Co.*, 23 F.3d 1175, 1184 (7th Cir. 1994) (author of particular article must be shown to be an authority); *Meschino* v. *North Am. Drager, Inc.*, 841 F.2d 429, 434 (1st Cir. 1988) (must show article itself to be reliable authority). This reliance is misplaced. The circumstances in which a treatise author incorporates the materials of others into his or her own work are very different from those in which a journal editor publishes articles authored by others, or in which an editor assembles chapters authored by others in a compendium. That the author of a treatise, established as a reliable authority, incorporates or relies on information attributable to others in his or her own work, published under his or her own name, is sufficient to vouch for the reliability of the material contained therein.[6] We presume that, when writing a treatise, an author includes material he or she believes to be authoritative or illustrative. In the context of a journal or periodical, however,

---

[6]The nineteenth edition of Williams, Obstetrics, the first edition of which was published in 1902, was authored by five physician professors at Parkland Memorial Hospital. Williams, Obstetrics (19th ed. 1993). The authors discussed the revisions made to the eighteenth edition of the text:

"To accomplish these extensive revisions, the voluminous literature relevant to all aspects of obstetrics and maternal-fetal medicine published since the completion of the Eighteenth Edition was reviewed. More than 3000 references have been added, along with 200 new figures and tables."

Williams, Obstetrics ix (19th ed. 1993). The authors of the 1993 edition added:

"Selected sections or chapters of the Eighteenth Edition have been expanded significantly to include more in-depth coverage of topics important to contemporaneous obstetrics. Some examples include the detailed description of the physiological and pathological principles of intrapartum fetal heart and uterine pressure monitoring. Complementing this is an expanded section to include *chapters describing various an-*

"[i]n these days of quantified research, and pressure to publish, an article does not reach the dignity of a 'reliable authority' merely because some editor, even a most reputable one, sees fit to circulate it." *Meschino* v. *North Am. Drager, Inc., supra* at 434.[7] A party seeking to introduce a statement contained in an authored treatise, as distinguished from an edited compendium, journal, or periodical, for the purpose of cross-examination under proposed rule 803 (18), must establish that the treatise, not the statement itself, is a reliable authority.[8]

The extent to which the text makes clear that the author either disavows the material, or that it is plainly irrelevant to the subject of the treatise, is the proper subject matter of the expert's redirect examination, once admitted. In this case, Dr. O'Toole's objections to the context and meaning of the chart may be addressed by "a fair opportunity to assess the statement in context and to comment on it, either during cross-examination or on redirect examination." *Sneed, supra* at 396.

---

*tepartum assessments of fetal health.*"

*Id.* It is within these chapters that the authors included the chart at issue. *Id.* at 1040.

[7]In *Blakeney* v. *Alabama Power Co.*, 222 Ala. 394, 398 (1931), the Supreme Court of Alabama dealt with a similar issue when addressing the admissibility of a statement of another contained in DaCosta's Modern Surgery. The court stated:

> "The objection is that the quotation itself shows it is hearsay merely, and not shown to come from good authority. Such objection misconceives the grounds on which the published opinions of standard authors are admitted. The mere fact that he fortifies his views by quotations, or by references to the statements of others, does not render such quotations or reference inadmissible as hearsay. The author's own words are hearsay in the sense that they are unsworn declarations of a third person. His standing as recognized authority gives sanction to his own statements and such as he may adopt from others and incorporate as part of his views."

*Id.* See Comment, Learned Treatises as Direct Evidence: The Alabama Experience, 1967 Duke L.J. 1169, 1172 ("fact that an author has merely reported the findings of others will not sustain a hearsay objection, since the author's demonstrated standing as an authority permits the use of his own statements and those of others which he has chosen to adopt and incorporate as his own").

[8]A similar chart contained within a chapter of a compendium or an article in a journal or periodical would be admissible under Proposed Mass. R. Evid. 803 (18) if an opponent of the expert witness establishes that the author of the chapter or article is "a reliable authority."

The judge in this case properly evaluated the reliability of the treatise, as opposed to the chart itself, when deciding whether the chart was admissible for use on cross-examination pursuant to proposed rule 803 (18). We agree with the Appeals Court's conclusion that, based on his ruling, it is "reasonable to infer from his decision to permit use of two-thirds of the chart that the judge considered the text Williams on Obstetrics to be 'a reliable authority.' "[9] *Brusard* v. *O'Toole*, 45 Mass. App. Ct. 288, 291 (1998). No apparent reason exists for excluding only one of the three columns.[10] Had the judge determined that the treatise was not a reliable authority, we presume he would not have allowed Brusard to use any aspect of the chart on cross-examination. The exclusion of column two for the purposes of cross-examination pursuant to proposed rule 803 (18) was error.

### B

The judge excluded the chart from evidence under G. L. c. 233, § 79C, which provides:

> "Statements of facts or opinions on a subject of science or art contained in a published treatise, periodical, book or pamphlet shall, in so far as the court shall find that the said statements are relevant and that the writer of such statements is recognized in his profession or calling as an expert on the subject, be admissible in actions of . . . tort for malpractice . . . ."

In affirming the judge's exclusion of the chart under G. L. c. 233, § 79C, the Appeals Court focused on whether the plaintiffs had established that "Manning and colleagues" are recognized as experts in their profession, relying on the statutory phrase "the *writer of such statements* is recognized in his

[9]There was ample evidence to support a conclusion that the treatise is a reliable authority. Dr. O'Toole testified that the treatise was used in medical schools for teaching purposes, and that he keeps a copy in his office to which he refers. The pediatric neurologist expert for the defense also testified on voir dire that Williams, Obstetrics, was the basic obstetrics textbook he had used in medical school and that it was an assigned text "in most medical schools."

[10]The Appeals Court noted: "Curiously, the judge permitted the plaintiffs to use the first and third columns in the cross-examination of defense experts but not the second column. The judge's reasoning on this point is not apparent despite our examination of the transcript of extensive sidebar discussions." *Brusard* v. *O'Toole*, 45 Mass. App. Ct. 288, 291 (1998).

profession . . . as an expert on the subject" (emphasis added), *supra* at 294-295, *Brusard* v. *O'Toole,* concluding that the "writer" of the chart in question was "Manning and colleagues," not the authors of the Williams treatise.[11]

When determining the admissibility of a published treatise under G. L. c. 233, § 79C, we interpret the "writer of such statements" to mean the treatise author, not the author of each individual item incorporated into the treatise text. There is nothing to suggest that G. L. c. 233, § 79C, contemplates a reliability analysis different from proposed rule 803 (18). Our discussion regarding the difference between the reliability of an authored treatise and a periodical published by an editor in the context of proposed rule 803 (18) is equally applicable in the context of G. L. c. 233, § 79C. In our view, the "writer" of a statement contained in an authored treatise is the author of the treatise, and the "writer" of a statement contained in a periodical or similarly edited publication is the author of the specific article in which the statement is contained.[12] The exclusion of the chart, to the extent that the judge based his ruling on Brusard's failure to lay a proper foundation regarding "Manning and colleagues," was error.[13]

---

[11]On appeal to this court, Brusard states that she does not challenge the Appeals Court's conclusion that the judge properly excluded the evidence under G. L. c. 233, § 79C. Our grant of further appellate review leaves all issues presented to the Appeals Court open for review. *Bradford* v. *Baystate Medical Ctr.,* 415 Mass. 202, 204 (1993) (this court may consider issues losing party pressed to Appeals Court but not in its application for further appellate review). Unlike *Bradford,* in this case Brusard was unsuccessful in the Appeals Court on the issue of the statutory exclusion, but prevailed in that court on the issue of the exclusion pursuant to proposed evidentiary rule 803 (18). She did not seek further appellate review. Dr. O'Toole, who had prevailed at trial and in the Appeals Court on the issue of the exclusion under G. L. c. 233, § 79C, sought further appellate review on other issues. He argues here, as he did in the Appeals Court, that the decision of the trial judge to exclude the chart under G. L. c. 233, § 79C, was proper. Although Brusard was the losing party on that issue, we see no reason not to apply the general rule expressed in *Bradford* v. *Baystate Medical Ctr., supra,* that we may consider all issues that were before the Appeals Court.

[12]Under G. L. c. 233, § 79C, as with proposed rule 803 (18), a chart, similar to the one at issue here, contained in a chapter written for a compendium, or in an article written for a journal or periodical, would be admissible if the author of the chapter or article is "recognized . . . as an expert." See note 8, *supra.*

[13]The statutory notice of the intent to introduce a treatise required by G. L.

## C

We have no difficulty concluding that these errors were prejudicial to Brusard. The critical issues at trial were whether Dr. O'Toole complied with the standard of care in treating Kaileigh and whether fetal asphyxia, as the plaintiffs contended, or emboli, as the defense argued, caused Kaileigh's stroke or strokes. As the Appeals Court correctly discussed at greater length, *Brusard* v. *O'Toole, supra* at 292-294, we cannot "say with substantial confidence that the error would not have made a material difference." *DeJesus* v. *Yogel,* 404 Mass. 44, 49 (1989). The opportunity to cross-examine the defense experts as to their opinions, in light of the chart, that Dr. O'Toole complied with the relevant standard of care and that emboli, not asphyxia, caused Kaileigh's strokes may well have changed the jury's evaluation of the experts' testimony.

The defendant argues, however, that in any event the chart contained in the 1993 edition of Williams, Obstetrics, was irrelevant to the standard of care to which he was held in 1990, and that any error caused by its exclusion was harmless for that reason. We disagree. A physician is held to the "standard of care and skill of the average member of the medical profession practicing his specialty" at the time of the alleged negligence. *Stepakoff* v. *Kantar,* 393 Mass. 836, 841 (1985). Defense experts cannot be cross-examined about discoveries or other knowledge developed after the acts complained of. But in the circumstances here, they were not required to do so. As noted in the 1993 edition, the chart at issue was published in the American Journal of Obstetrics and Gynecology in 1987, three years prior to the defendant's alleged negligence. Williams, Obstetrics 1043 (19th ed. 1993). The same chart is contained in the earlier 1989 edition of Williams, Obstetrics. Compare Williams, Obstetrics Table 45-4, at 1040 (19th ed. 1993), with Williams, Obstetrics Table 15-4, at 294 (18th ed. 1989). Even if the chart had not been contained in the 1989 edition, the information contained in the chart printed in the 1993 edition was relevant to the opinion of the defense experts, rendered at trial in 1995, regarding whether fetal asphyxia caused Kaileigh's brain injury.

---

c. 233, § 79C, requires that "the date of publication" of the treatise be specified. The edition of a treatise, if applicable, should be specified, and parties should be permitted to introduce statements from only that edition.

## D

We agree with the reasoning and conclusion of the Appeals Court that Brockton Hospital's written policies and procedures constitute inadmissible hearsay and did not come under any exception. *Brusard* v. *O'Toole, supra* at 295. The judge properly excluded this evidence.

The judgment is vacated and the case is remanded to the Superior Court for a new trial.

*So ordered.*