SUPERIOR COURT 
 
 MICHAEL F. HOLICK, PH.D., M.D. v. BOSTON MEDICAL CENTER AND EVANS MEDICAL FOUNDATION, INC.

 
 Docket:
 2184CV01454-BLS2
 
 
 Dates:
 April 29, 2025
 
 
 Present:
 Kenneth W. Salinger Justice of the Superior Court
 
 
 County:
 SUFFOLK
 

 
 Keywords:
 DECISION AND ORDER ALLOWING DEFENDANTS’ MOTION FOR SUMMARY JUDGMENT
 
 

 Dr. Michael F. Holick used to serve as Chief of Endocrinology, Diabetes, and Nutrition for Boston Medical Center (“BMC”), was Director of BMC’s Bone Health Care Clinic, and was employed through the faculty practice plan for BMC’s Department of Medicine (the Evans Medical Foundation, Inc., or “Evans”). In early 2019, BMC’s Board of Trustees voted to limit Dr. Holick’s clinical privileges to diagnosing and treating patients over the age of twelve. In early 2021, after a hearing process, the Trustees terminated Dr. Holick’s staff appointment and privileges at BMC, which had the effect of ending his employment by Evans. Dr. Holick then accepted new employment as a Professor at the Boston University School of Medicine (“BUSM”).
Dr. Holick contends that the Trustees voted to limit and then terminate his clinical privileges because Holick had criticized colleagues who diagnosed injuries in young children as resulting from non-accidental trauma, such as child abuse, without evaluating whether the injuries could have been caused by a particular genetic disorder. Dr. Holick claims that BMC and Evans thereby violated the Medical Whistleblower Statute, breached his contractual rights under the medical staff bylaws, and wrongfully terminated his employment in violation of public policy.
The Court will allow Defendant’s motion for summary judgment as to all three of these claims.
The Medical Whistleblower Statute claim fails because Dr. Holick did not engage in any activity that is protected by G.L. c. 149, § 187. Though Dr. Holick objected to testimony by other physicians in cases of alleged child abuse that he believed was based on inadequate diagnoses, those objections did not implicate this statute because Dr. Holick’s concerns were not based on any established professional standards of practice and he never filed a formal report, complaint, or incident report with a medical peer review committee, in
 
                                                            -1-
 
court, or with any other body. Dr. Holick’s expressions of concern to BMC supervisors were not protected by this statute because they were based on personal beliefs that differ from the existing standard of practice.
The contract claim fails because Dr. Holick has mustered no evidence that the Trustees’ 2019 vote caused him to suffer any economic damage, or that the subsequent hearing process and the Trustees’ 2021 vote deprived him of any contractual rights or caused economic harm.
The wrongful termination claim fails because there is no evidence that the vote to terminate Dr. Holick’s staff appointment and clinical privileges, and therefore terminate his employment through Evans, violated any statute or was made to punish Dr. Holick for asserting a legally guaranteed right, doing what the law requires, or refusing to do what the law forbids.[1]
 
--------------------------------------------
 
[1] The Court has generally not considered arguments that Dr. Holick raised in his scores of footnotes, because the footnotes are in tiny print that violates Superior Court Rule 9A and the generous page limit set by the Court, and because    Dr. Holick waived points that he alludes to only in footnotes.
The Court granted Dr. Holick’s request for leave to file a 35-page opposition brief. Absent leave of court, Superior Court legal memoranda are limited to 20-pages. See Superior Court Rule 9A(a)(5)(iv). All such memoranda must be in 12-point, double-spaced type; footnotes and indented quotations may be single-spaced, but must also appear in 12-point type. Id. ¶ (ii).
Not satisfied with the 75 percent increase in his page limit, Dr. Holick stuffed 110 tiny footnotes into his memorandum, all of them in 10-point Times New Roman type (which looks like this, and is very hard to read). Doing so violated the rule that footnotes must be in 12-point type, and was a deliberate and impermissible attempt to circumvent the page limit approved by the Court. Cf. Varda, Inc. v. Ins. Co. of N. Am., 45 F.3d 634, 640 (2d Cir. 1995) (improper to use extensive “textual footnotes to evade page limits”) (quoting Production & Maintenance Employees' Local 504 v. Roadmaster Corp., 954 F.2d 1397, 1407 (7th Cir. 1992)); Lath v. Oak Brook Condominium Owners’ Assoc., 2017 WL 4180171, at *2 & n.2 (D.N.H. June 5, 2017) (striking memorandum as sanction for using 166 footnotes in very small font to circumvent generous page limit).
The Court deems arguments relegated to Dr. Holick’s footnotes to have been waived. A party opposing a motion in the Superior Court must submit a written memorandum “that includes a statement of reasons, with supporting authorities, that the motion should not be allowed.” Sup. Ct. Rule 9A(a)(2). Parties therefore waive issues or arguments that they do not raise and develop
<continued…>
 
                                                            -2-
 
1. Factual Background. The following facts are not in dispute for purpose of Defendants’ motion for summary judgment.
Dr. Holick was recruited in 1987 to become Chief of Endocrinology, Diabetes, and Nutrition for Boston City Hospital. That institution merged with University Hospital in 1996 to form Boston Medical Center. Dr. Holick continued in the same role for BMC, and also became Director of its Bone Health Care Clinic. During this time, Dr. Holick held unpaid faculty positions with BUSM (BMC’s academic affiliate) in the departments of medicine, dermatology, physiology and biophysics, and molecular medicine.
1.1. Dr. Holick’s Testimony about hEDS and Suspected Child Abuse. Since 2011, Dr. Holick has testified in dozens of legal proceedings involving allegations of child abuse against an infant’s parent or other family member. He has typically concluded and testified in these cases that unexplained multiple fractures in an infant could have been caused by bone fragility associated with Hypermobile Ehlers-Danlos Syndrome (“hEDS”), rather than by non-accidental trauma inflicted by the parent or someone else.
The Ehlers-Danlos Syndromes are fourteen connective tissue disorders that present with unusually stretchy and fragile skin and hyperextensible joints. All of the EDS variants, including hEDS, are genetic and autosomal dominant. That means if one parent carries an altered gene that causes the disorder then their child will have a fifty percent chance of acquiring the disorder, and if both parents carry the gene there will be a seventy-five percent chance that their child will acquire the disorder.
Thirteen of the EDS variants are associated with particular causative genes that can be detected in a blood test. In contrast, no underlying genetic cause has been identified for hEDS, and therefore this variant cannot be detected in a genetic test of one’s blood.
 
--------------------------------------------
 
in their written opposition. An undeveloped assertion buried in a footnote does
not suffice. See Boston Edison Co. v. Massachusetts Water Res. Auth., 459 Mass. 724, 726 n.3 (2011) (argument relegated to footnote is waived); see also McCullen v. Coakley, 571 F.3d 167, 182 n.3 (1st Cir. 2009) (“avoiding waiver requires more than a hint that a particular theory may be lurking; it necessitates some developed argumentation addressed to that particular theory”).
 
                                                            -3-
 
Dr. Holick believes that, if a mother has joint hypermobility and other symptoms consistent with a possible diagnosis of hEDS, then their infant will have an increased risk of bone fractures.
It is undisputed that this view is not accepted by the medical community at large. The consensus view is that even if a mother has been diagnosed as having hEDS, that is not associated with an increased fracture risk in her infant child, and that children with a genetic disposition for hEDS do not present with multiple fractures in infancy or early childhood.
Dr. Holick also believes that children under five years old may be diagnosed as having hEDS. He has been able to identify only two other physicians who share this view.
It is undisputed that hEDS cannot definitively be diagnosed or ruled out in children under five years old, because the joints of very young children are more flexible than those of older children and adults, joint hypermobility may be the result of many other genetic causes, and there is no genetic test for hEDS. In 2017, the American College of Medical Genetics and Genomics published hEDS diagnostic criteria that are applicable only to adults and post-pubescent adolescents. In 2023, an international group developed a separate hEDS diagnostic checklist for prepubescent children five years of age and older.
1.2. Dr. Holick’s Criticism of BMC Colleagues. In May 2016, Dr. Holick informed BMC’s Chief Medical Officer (Dr. Ravin Davidoff) that Holick and another BMC Physician (Dr. Schwartz) had provided conflicting testimony in a court proceeding regarding suspected child abuse, and that based in part on Dr. Holick’s testimony the judge in that case had returned those children to their parents.
Later in 2016, Dr. Holick began criticizing testimony by a different BMC colleague (Dr. Hoffman, who is a pediatric geneticist) in a case of suspected child abuse. That case involved an infant and family known to Dr. Holick. He had previously testified in court on behalf of the child’s parents in connection with an earlier allegation of child abuse. Dr. Holick’s testimony convinced the judge to order that the child be returned to the parents.
Two weeks later, the mother became concerned about lesions on the side of the child’s torso, and brought the child to BMC to be evaluated. The treating physician concluded—based on the patient’s medical history, imaging studies, laboratory values, and a detailed physical examination—that the child did not
 
                                                            -4-
 
meet the criteria for osteogenesis imperfecta or hEDS and that the cause of his bruising and fracture was unknown. This treating physician then testified to those conclusions in court, and the child was again removed from their parents and placed in foster care.
In December 2016, Dr. Holick wrote to Dr. Davidoff to express concern about this physician’s court testimony. Dr. Holick stated that “capillary fragility is associated with this form of EDS” and asserted that the treating physician in this case had misdiagnosed the child as having been the victim of child abuse. Dr. Holick said that “the hospital should be concerned about the incompetence of the doctor who saw this child” and that “a lawsuit should be brought against her and I would presume the institution that she represents.”
In late May 2017, Dr. Holick emailed BMC’s President and CEO (Kate Walsh), copying the chair of the Department of Medicine (Dr. David Coleman) and the chief of the Department’s Endocrine Section (Dr. Alan Farwell), to discuss Dr. Holick’s court testimony in cases of suspected child abuse and his belief that infants with at least one parent who has EDS could suffer bone fractures because they acquired this genetic disorder, and thus should not be diagnosed as having been injured by nonaccidental trauma. Later that day he sent a follow-up email to the same three people in which he again criticized the treating physician involved in the 2016 case for diagnosing that infant’s bruising as being caused by child abuse rather than as resulting from hEDS.
1.3. Events Leading to 2019 Restriction of Clinical Privileges. In August 2016, Dr. Holick agreed in a conversation with Dr. Davidoff that he would no longer see any children under the age of 13 in the Endocrine Clinic at BMC.
In early 2017, Dr. Holick nonetheless examined two infants at the BMC clinic. In both cases, Dr. Holick was examining an adult woman and providing her with guidance on how to deal with her medical issues associated with EDS. The adult patients asked Dr. Holick to examine her two-year old daughters and determine whether they had EDS. Dr. Holick testified that several times he told the adult patients that he was not permitted to see children in the clinic, but that he “finally gave in” and did examine the two infants.
Dr. Holick admitted to Dr. Farwell in May 2017 that he had seen the children of several mothers who had scheduled visits about their own EDS. Dr. Coleman met with Dr. Holick two days later to express BMC’s concern that Dr. Holick was continuing to see pediatric patients at BMC concerning EDS.
 
                                                            -5-
 
Dr. Coleman followed up in writing in August 2017. In this letter, Coleman again instructed Holick that he could not “schedule, see, or evaluate patients under 13 in any clinical space at BMC.” Dr. Coleman also made clear that    Dr. Holick remained “free to continue your expert witness evaluations of children outside BMC on your own time” so long as he complied with BUSM policy. But Dr. Coleman made clear that Dr. Holick “may not use BMC or BUSM letterhead for your expert testimony activities,” and that he must make clear in any testimony that he ”did not see the child as part of clinical care at BMC.” Dr. Coleman cautioned that if Dr. Holick were to violate this policy his clinical privileges and faculty appointment could be terminated.
In December 2018, Dr. Coleman sent another letter to Dr. Holick, this time expressing concern about recent testimony in which Holick stated that he was diagnosing childing under age 13 in BUSM’s General Clinical Research Center (“GCRC”). Coleman noted that Holick was seeing children there evaluating them pursuant to a research protocol for indications of EDS. But Coleman informed Holick that he was acting improperly by “diagnosing the children based on these evaluations, which is not permissible, and then … using these diagnoses to render opinions in legal proceedings.” Dr Coleman instructed Dr. Holick that he was “not allowed to diagnose or treat children in the GCRC, or anywhere, at Boston Medical Center or Boston University.”
Dr. Holick followed up by emailing Dr. Coleman in early February 2019 to confirm his understanding that he could continue his “IRB approved clinical research program on EDS patients with the stipulation” that he could not “see children for the purpose of making a diagnosis or providing any treatment recommendations.” In response, Dr. Coleman agreed that Dr. Holick’s “current research protocol can move forward,” reiterated that Dr. Holick was “not allowed to render a diagnosis on any patient under age 13 on the BU medical campus,” and clarified that the research protocol stated that diagnosis of children “is only allowed for purposes of classifying your research results” and “must not be shared with any outside entity or person.” Dr. Holick wrote back to confirm that “[t]he diagnosis of the child will not be shared outside of the institution except when being de-identified for publication purposes.”
Eight days later, on February 12, 2019, BMC’s Board of Trustees voted unanimously to restrict Dr. Holick’s clinical privileges to diagnosing and treating patients over the age of twelve. BMC reported this action to the Board of Registration in Medicine. On February 19, Dr. Farwell informed Dr. Holick
 
                                                            -6-
 
about the Trustees’ vote and gave him a copy of BMC’s report of that vote to the Board of Registration.
Dr. Holick did not complain to Dr. Coleman, Dr. Davidoff, Ms. Walsh, or the Board of Trustees in 2019 or 2020 about this restriction on his privileges.
1.4. Termination of BMC Clinical Privileges and Staff Appointment. During the Summer of 2020, Dr. Coleman became concerned that Dr. Holick had filed expert witness reports suggesting that during 2019 and 2020 he had continued to examine young children who were enrolled in his clinical research program, conclude that injuries they had sustained could have been caused by bone fragility associated with hEDS, and share those conclusions in expert reports and perhaps in expert testimony in connection with court proceedings about possible child abuse.
In September 2020, Dr. Coleman informed Dr. Holick that he would be seeking to terminate Dr. Holick’s clinical privileges. On September 4, Holick sent an email asking Coleman to explain “exactly what I am being accused of doing that has violated my letter of agreement.” Dr. Coleman responded by email six days later. He explained his view that Dr. Holick had filed an expert report in a court case in November 2019 stating that he had examined a child in the GCRC as part of his research study, made a diagnosis of that child, and use the diagnosis as the basis for his expert opinions in that court proceeding.
Dr. Holick sent a 12-page letter urging the Medical Executive Committee (“MEC”) not to vote to revoke his privileges. The MEC met on October 6.       It approved Dr. Coleman’s recommendation to terminate Dr. Holick’s staff appointment and medical privileges at BMC. The next day Dr. Davidoff wrote to notify Dr. Holick about the MEC’s decision and to inform him of his right to request a hearing before an ad hoc committee of the Medical Staff. Dr. Holick promptly exercised that right.
The Ad Hoc Committee conducted the hearing requested by Dr. Holick on December 10, 2020. Dr. Coleman presented information in support of the recommendation to revoke Dr. Holick’s privileges and terminate his staff appointment. Dr. Holick was given the opportunity to present evidence, including testimony by other witnesses, and to cross-examine Dr. Coleman.
Dr. Davidoff notified Dr. Holick on January 6, 2021, that the Ad Hoc Committee had recommended and the MEC had approved a modified sanction, under which Dr. Holick’s medical privileges would be suspended for nine months
 
                                                            -7-
 
and thereafter there would be continuing restrictions on his privileges and his research activities would be monitored by the Departments of Medicine and Pediatrics. Dr. Davidoff also informed Dr. Holick that he had the right to challenge that recommendation by seeking a hearing before an ad hoc committee of the Board of Trustees. Dr. Holick promptly exercised that right.
The Board’s Committee invited Dr. Holick to present oral argument on February 5, 2021.
After that hearing, BMC’s Board of Trustees voted on February 9, 2021, to terminate Dr. Holick’s staff appointment and privileges at BMC. The President and CEO, Kate Walsh,  wrote to inform Dr. Holick of this vote the next day.  In her letter, Ms. Walsh stated that the Board “took this action because of your actions that constitute practice outside the restrictions and limitations on your Boston Medical Center clinical privileges,” and that the Board “made no determination about the conduct of your research at Boston University.”
1.5. Subsequent Employment at BUSM. Eight days later, on February 17,   Dr. Coleman and Dr. Farwell extended to Dr. Holick an offer of paid employment at BUSM with an initial term starting retroactively on February 9. The offer letter was signed as being approved by BUSM’s Provost and Dean.
In this letter, Dr. Coleman and Dr. Farwell explained that, under the terms of his Physician Practice Agreement, Dr. Holick’s employment and PPA with Evans automatically terminated on February 9 when the Trustees voted to terminate his clinical privileges and staff appointment at BMC.
They then offered Dr. Holick employment in BUSM’s Department of Medicine, Section of Endocrinology, with an effective date of February 9. They stated that this offer was being made to help Dr. Holick continue his research program as a member of the faculty of the Department of Medicine. Dr. Holick already had a BUSM faculty appointment at the rank of Professor, which was to continue if he accepted this offer. Previously, however, he was employed and paid by Evans, not by BUSM.
The offer letter also reminded Dr. Holick the General Clinical Research Unit (formerly called the GCRC) is a research space only, is not licensed for the practice of medicine, and that Dr. Holick could not practice medicine at any location on the Medical Campus of BUSM.
Dr. Holick accepted this offer of new employment on March 10, 2021. The summary judgment record indicates that his starting salary at BUSM was to be
 
                                                            -8-
 
$230,000 per year, assuming that he brought in sufficient research grant funding to cover his salary and fringe benefits.
2. Medical Whistleblower Statute Claim. Count I of Dr. Holick’s complaint asserts a claim that Defendants violated G.L. c. 149, § 187, which the Appeals Court most recently referred to as the “medical whistleblower statute.” See Luu v. Fallon Service, Inc., 105 Mass. App. Ct. 236, 239 (2025).2 “Section 187(b) prohibits health care facilities from ‘refus[ing] to hire, terminat[ing] a contractual agreement with or tak[ing] any retaliatory action against a health care provider’ for engaging in any of the acts protected under the section.” Romero v. UHS of Westwood Pembroke, Inc., 72 Mass. App. Ct. 539, 540 (2008), quoting § 187(b). Dr. Holick contends that Defendants violated § 187(b), ¶¶ (1), (3), and (4).
2.1. No Violation of G.L. c. 149, § 187(b)(1) or (3). To succeed on a claim under § 187(b)(1) or (3), a plaintiff must establish: (1) either that (a) they disclosed or threatened to disclose to a “manager” of a health care facility or to a “public body”, or that (b) they objected to or refused to participate, in some activity, policy, or practice that (2) they “reasonably believed to be in violation” of a law, rule, regulation, or “professional standard of practice,” (3) which they “reasonably believed posed a risk to public health,” and that (4) they were “retaliated against as a result.” See Romero, 72 Mass. App. Ct. at 541; G.L. c. 149, § 187(b)(1) & (3). The “reasonably believes” language in § 187(b)(1) and (3) imposes an objective standard, meaning that “a plaintiff’s belief must be objectively reasonable.” Romero, supra, at n.3.
Defendants are entitled to summary judgment on this part of the whistleblower claim because Dr. Holick has mustered no evidence that he reasonably believed the conduct or practices he complained about to BMC management violated any law, rule, regulation or  professional standard  of  practice. See Romero,  72 Mass. App. Ct. at 542 (affirming summary judgment on this ground); see generally Kourouvacilis v. General Motors Corp., 410 Mass. 706, 715 (1991) (“If the nonmoving party cannot muster sufficient evidence to make out its claim, a
 
--------------------------------------------
 
[2] No one name for this statute has caught on. Appellate courts have also referred to § 187 as the “healthcare provider whistleblower statute,” the “Massachusetts medical provider whistleblower statute,” and the “health care whistleblower statute.” Blanchard v. Steward Carney Hosp., Inc., 477 Mass. 141, 145 n.8 (2017); Romero v. UHS of Westwood Pembroke, Inc., 72 Mass. App. Ct. 539, 540 (2008); Commodore v. Genesis Health Ventures, Inc., 63 Mass. App .Ct. 57, 58 (2005).
 
                                                            -9-
 
trial would be useless and the moving party is entitled to summary judgment as a matter of law.”) (quoting Celotex Corp. v. Catret, 477 U.S. 317, 328 (1986) (White, J., concurring)).
In other words, since the record establishes that Dr. Holick will not be able to prove the second element of this part of his whistleblower claim, Defendants are entitled to summary judgment on that part of his complaint. See Romero, supra. The dispute as to whether Dr. Holick could establish the third and fourth elements of this part of his whistleblower claim is therefore beside the point. “A nonmoving party’s failure to establish an essential element of her claim ‘renders all other facts immaterial’ and mandates summary judgment in favor of the moving party.” Roman v. Trustees of Tufts College, 461 Mass. 707, 711 (2012), quoting Kourouvacilis, 410 Mass. at 711.
Dr. Holick strongly and sincerely believes that young children with a least one parent who suffers from hEDS may experience bone fractures, bruising, or both because they acquired hEDS from their parent, and that therefore a physician asked to diagnose a young child who presents with such injuries must take a careful family history and determine whether either parent may have hEDS.
But Dr. Holick does not contend that any law, rule, or regulation requires physicians to investigate whether a parent may have hEDS before diagnosing a suspected victim of child abuse or any other child who presents with bone fractures or bruising.
Nor has Dr. Holick shown that any professional standard of practice requires physicians to consider hEDS as a possible cause of injury in children under the age of five years old.
Since § 187 does not define the phrase “professional standard of practice,” we must presume that this statute incorporates the common-law definition of the equivalent term “standard of care” with respect to claims of medical malpractice. See generally Jinks v. Credico (USA) LLC, 488 Mass. 691, 700 (2021) (undefined statutory term presumed to incorporate common-law definition); Commonwealth v. Clark, 446 Mass. 620, 625 (2006) (“We may look to preexisting common law as an aid to the construction of undefined terms in a statute.”); see also Securities and Exchange Comm’n v. Jarkesy, 603 U.S. 109, 125 (2024) (when a legislature “transplants a common-law term, the old soil comes with it”).
The professional standard of practice or care that a physician must follow “is based on the care that the average qualified physician” in the same specialty or
 
                                                            -10-
 
area of practice “would provide in similar circumstances.” Palandjian v. Foster, 446 Mass. 100, 104 (2006). “[T]his standard does not require physicians to provide the best care possible.” Id. at 105. Instead, “what the average qualified physician would do in a particular situation is the standard of care” (emphasis in original). Id. at 105. As a result, “the actions that a particular physician, no matter how skilled, would have taken are not determinative.” Id. at 104–105.
Establishing the applicable standard of practice or care for a medical professional in a particular field almost always requires expert testimony by someone with “sufficient knowledge of the practices of other physicians to assert that the average qualified practitioner would, or would not, take a particular course of action in the relevant circumstances.” Palandjian, 446 Mass. at 106.
Defendants have presented unrebutted expert testimony that hEDS cannot definitively be diagnosed or ruled out in children under five years old, that evidence that a young child’s parent has hEDS is not associated with an increased fracture risk in their infant children, and that therefore the standard of care for pediatricians seeking to diagnose young children suffering from multiple fractures does not require them to rule out hEDS as a cause before concluding that the child was injured by non-accidental trauma.
In his memorandum, Dr. Holick concedes that “many pediatricians specializing in child abuse often decline to consider EDS as an explanation for young children’s injuries.” And he has presented no expert testimony suggesting that the professional standard of practice in diagnosing young children suffering from bruising or bone fractures requires taken a detailed family history and considering whether the child may have inherited hEDS.
That Dr. Holick has been permitted to provide expert testimony about the possible causes of injury in cases of suspected child abuse does not mean he is an expert regarding the applicable standard of care that should be followed by other physicians. Compare Palandjian, 446 Mass. at 106. Opinion testimony about whether infant’s injuries may have been caused by hEDS rather than by non-accidental trauma has nothing to do with the applicable standard of practice in diagnosing infants.
Since Dr. Holick has been unable to muster any expert testimony suggesting that physicians who diagnose injuries in young children under the age of five violate any professional standard of practice if they do not consider hEDS as a
 
                                                            -11-
 
possible cause and take a careful family medical history to determine the odds of the child inheriting hEDS, he cannot prove this element of his claim under § 187(b)(1) or (3). Defendants are therefore entitled to summary judgment in their favor on that part of Dr. Holick’s whistleblower claim.
Dr. Holick’s “personal views” about whether infants may present with symptoms suggesting hEDS and therefore that clinicians should take a family history focused on hEDS symptoms in an infant’s parents are “not enough to support [his] claim,” and thus not enough to defeat summary judgment, because they are “unsupported by reference to any statutory, regulatory, or professional standard of practice.” Romero, 72 Mass. App. Ct. at 542 (affirming summary judgment on this ground).
Dr. Holick is entitled to disagree with the consensus view among physicians about what considerations are relevant in diagnosing a young child who has suffered multiple fractures or severe bruising and may have been a victim of child abuse.
But since his personal views do not constitute a “standard of practice” that other physicians must follow, Dr. Holick’s complaints that other clinicians instead follow the undisputed standard of care and do not consider hEDS as a cause of such injuries in very young children were not protected by the Medical Whistleblower Statute. Id. An “internal debate among health care professionals” about how best to handle aspects of their medical practices “is not the basis for a claim under G.L. c. 149, § 187.” Id.
2.2. No Violation of G.L. c. 149, § 187(b)(4). In an attempt to circumvent his burden under § 187(b)(1) & (3) of proving he reasonably believed that a colleague had violated a “professional standard of practice,” Dr. Holick argues that a reasonable fact finder could determine that he engaged in conduct protected by § 187(b)(4) by expressing concerns to supervisors at BMC.
Section 187(b)(4) makes it unlawful to retaliate because a health care provider either (I) “participates in any committee or peer review process” or (ii) “files a report or a complaint, or an incident report discussing allegations of unsafe, dangerous or potentially dangerous care.”
Dr. Holick does not contend that he did anything protected by the first part of this provision, but argues that his emails to BMC management disagreeing with colleagues’ diagnoses constituted the “filing” of a “report or complaint” alleging “unsafe, dangerous or potentially dangerous care.”
 
                                                            -12-
 
The Court disagrees.
The verb “file” can mean many things, but in this context the most relevant common meanings of the word are “to place among official records as prescribed by law” or “to initiate (as a legal action) through proper formal procedure.” See Merriam-Webster's Collegiate Dictionary at 434 (10th ed. 2001).
The word “ ’File’ connotes something formal and official.” Cent. Hous. Assocs., LP v. Olson, 929 N.W.2d 398, 408 (Minn. 2019). Thus, a statute barring retaliation against a tenant for “filing” a complaint makes it unlawful for a landlord to retaliate against a tenant for submitting a complaint to a government entity or commencing a legal proceeding, but does not protect tenants “for complaining directly to the landlord.” Id. at 407–408.
Similarly, § 187(b)(4) bars retaliation against a health care provider who files a formal complaint or report with a peer review committee, a State board of registration, in court, or with some other official body or government entity. But it does not protect less formal disclosures to supervisors or management of a health care entity, because that is the subject of § 187(b)(1).
The Legislature protected health care providers against retaliation for making internal complaints to their managers about the provision of medical care, but only where those complaints are based on an objectively reasonable belief that the care at issue has violated some law, rule, regulation, or “professional standards of practice.” See G.L. c. 149, § 187(b)(1). It did not similarly limit the protections in § 187(b)(4) for someone who “files” a report, complaint, or incident report.
The reference in § 187(b)(4) to a health care provider who “files a report or complaint” must therefore mean something different than the reference in § 187(b)(1) to a provider who “discloses or threatens to disclose” certain kinds of concerns “to a manager.” Where different language is used in different paragraphs of the same statute, the provisions mean different things. See Ginther  v. Commissioner of  Insurance, 427 Mass. 319, 324 (1998);  Tamulevich  v. Robie, 426 Mass. 712, 713–714 (1998).
Dr. Holick’s broad interpretation of § 187(b)(4) as encompassing any disclosure of concerns about the quality of care at a health care facility cannot be correct, because it would effectively read § 187(b)(1) out of the Medical Whistleblower Statute. See generally Shirley Wayside Ltd. Partnership v. Board of Appeals of
 
                                                            -13-
 
Shirley, 461 Mass. 469, 477 (2012) (courts should “interpret a statute to give effect to all its provisions, so that no part will be inoperative or superfluous”) (quoting Connors v. Annino, 460 Mass. 790, 796 (2011) (internal quotation marks omitted)).[3]
3. Breach of Contract Claim. Count II of Dr. Holick’s complaint asserts a claim for breach of contract. Massachusetts appellate courts have assumed but not yet decided that a hospital’s medical staff bylaws give physicians contractual rights. See Ayash v. Dana-Farber Cancer Inst., 443 Mass. 367, 386 (2005); Katz v. Children’s Hops. Corp., 33 Mass. App. Ct. 574, 576 (1992). The Court will similarly assume without deciding that the Bylaws of BMC’s Medical-Dental Staff create contractual rights that may be enforced by physicians and others to whom the bylaws apply, and that Dr. Holick is therefore entitled to assert a claim for breach of contract to challenge alleged violations of those bylaws.
3.1. 2019 Restriction of Privileges. A trier of fact could find that the Trustees breached Dr. Holick’s contractual rights when they voted to restrict his clinical
 
--------------------------------------------
 
[3] This is why the Medical Whistleblower Statute must be read differently than  the anti-retaliation provisions of the Wage Act or the general Massachusetts antidiscrimination statute. The Wage Act makes it unlawful to retaliate against an employee for having “made a complaint to the attorney general or any other person” or, more broadly, for having taken “any action … to seek his or her rights” under the statute. See G.L. c. 149, § 148A. This provision protects employees who make an internal complaint about wage law violations to their manager, because such an internal complaint constitutes taking “any action” or having “made” a complaint to “any … person.” See Smith v. Winter Place LLC, 447 Mass. 363, 367 (2006). Similarly, Chapter 151B makes it unlawful to discharge or otherwise discriminate against someone because they have “opposed any practices forbidden under this chapter” or “filed a complaint, testified or assisted in any proceeding under section five.” G.L. c. 151B, § 4(4). An employee who lodges an internal complaint with their employer about allegedly unlawful discrimination has “opposed” forbidden practices and therefore is protected by this antiretaliation provision. See Ritchie v. Department of State Police, 60 Mass. App. Ct. 655, 664–665 (2004). In contrast to the Medical Whistleblower Statute, reading the anti-retaliation provisions of the Wage Act and c. 151B as protecting all employees who make a relevant internal complaint to their employer does not require that different language used in different parts of the same statute be construed as meaning the same thing, or render any other part of those statutes superfluous.
 
                                                            -14-
 
privileges in early 2019, because the Bylaws do not appear to allow the Board to act on its own motion to restrict or terminate a physician’s privileges.
Defendants are nonetheless entitled to summary judgment on this aspect of the breach of contract claim because Dr. Holick “has offered no evidence that [he] suffered compensable loss as a result of the [alleged] breach.” See  Ayash,    443 Mass. at 388 (vacating judgment  against  hospital).  If  BMC  breached  Dr. Holick’s procedural rights under the bylaws by restricting his clinical privileges in 2019, he is only entitled to recover damages to compensate “for economic losses suffered as a result.” Id. BMC “is liable neither for negative effects on the plaintiff's future career nor for the plaintiff's emotional distress.” Id.; accord McCone v. New England Tel. and Tel. Co., 393 Mass. 231, 234 n.8 (1984) (damage to one’s professional or business reputation not recoverable on claim for breach of contract).
Dr. Holick has mustered no evidence that his compensation by Evans was reduced, or that he lost any other income or suffered any other kind of economic loss, because the Trustees restricted his clinical privileges and reported their action to the Board of Registration in 2019. Though Dr. Holick suggests that he may have lost out on the opportunity to testify or provide an opinion as an expert witness in at least one case, he does not contend and presents no evidence that he lost out on any compensation as a result.
3.2. 2021 Termination of Privileges and Staff Appointment. Defendants are also entitled to summary judgment in their favor with respect so much of    Dr. Holick’s breach of contract claim that is based on the hearing process in late 2020 and early 2021 and on the Trustee’s vote to terminate his staff appointment and privileges in February 2021.
Dr. Holick contends that Defendants breached his rights under the Bylaws during this hearing and termination in several ways. None of these arguments has merit.[4]
First, Dr. Holick contains that he did not receive a written statement of the reasons why Dr. Coleman was recommending that his privileges be terminated
 
--------------------------------------------
 
[4] Dr. Holick presents no argument in his written opposition that Defendants did anything that constitutes a violation of the implied covenant of good faith and fair dealing. He therefore waived this part of his claim for breach of contract, for purposes of evaluation Defendants’ motion for summary judgment.
 
                                                            -15-
 
until Dr. Holick asked for one, and that Dr. Coleman provided the statement by email rather than by certified mail.
But Dr. Holick does not contend and has presented no evidence suggesting that the written notice that Dr. Coleman  provided upon  request failed to  give   Dr Holick the information required Bylaws art. VII, § 3.2.
And although § 1.3 provides that all notices required under art. VII “shall be sent by certified mail,” Dr. Holick concedes that he did in fact receive this notice. It therefore does not matter whether that actual notice was accomplished using certified mail or email. If a contract specifies that notice must be provided by registered or certified mail, any notice that is actually received will be effective even if it was instead sent or delivered in some other way. See Computune, Inc. v. Tocio, 44 Mass. App. Ct. 489, 493 (1998); Gerson Realty Inc. v. Casaly, 2 Mass. App. Ct. 875, 875 (1974). “The function of a requirement that notice be transmitted by registered [or certified] mail is to provide a means of resolving disputes as to the fact of delivery of the notice.” Computune, supra, quoting Gerson Realty, supra.
Second, Dr. Holick complains that he was not allowed to have counsel present at the hearing before the Ad Hoc Committee of the Medical Staff. But the Bylaws expressly provide, in art. VII, § 4.10, that members may not be represented by an attorney “at any phase of the hearing.” Dr. Holick was entitled under § 4.5 to be represented “by a member of the Medical Staff in good standing,” but had no contractual right to have his lawyer be present.
Third, Dr. Holick criticizes the hearing process on the ground that “there was no consideration of his clinical care at BMC” and no evidence presented that he provided substandard clinical care. But Dr. Holick cites no Bylaw provision requiring that any such finding be made and supported by evidence before a physician’s privileges may be terminated. According to the letter from BMC’s CEO, the Trustees voted to terminate Dr. Holick’s privileges because he had engaged in “practice outside the restrictions and limitations on [his] Boston Medical Center clinical privileges.” Nothing in the Bylaws suggests that this is an impermissible ground for revoking a physician’s privileges.
Fourth, Dr. Holick contends that Dr. Davidoff improperly provided information to the Ad Hoc Commission when Dr. Holick was not present, and thereby deprived Dr. Holick of his contractual right under art. VII, § 4.9, to
 
                                                            -16-
 
cross-examine all witnesses. But the evidence that Dr. Holick cites does not support this assertion.
Dr. Davidoff first testified at his deposition that, although he was present when the committee deliberated, he did not remember if he “spoke during that at all.” Dr. Holick’s counsel then asserted that some unidentified person had “admitted that you spoke to them and provided information during deliberations” and asked, “Does that sound incorrect to you?” Dr. Davidoff responded by saying, “No, I think I may have provided information.”
Notwithstanding the  representation  by  counsel  during  this  deposition,  Dr. Holick has presented no evidence that Dr. Davidoff did in fact provide any “information” to the Ad Hoc Committee. Nor has Dr. Holick mustered any evidence that if Dr. Davidoff said something to Ad Hoc Committee it was material, did not merely repeat something that was already known or not in dispute, and that it therefore would have been something as to which cross- examination would have been appropriate.
No reasonable fact finder could find, based on this record, that Dr. Davidoff secretly told the Ad Hoc Committee anything of any substance. Absent such a finding, no fact finder could reasonably conclude at trial that Dr. Holick was deprived of his contractual right to cross-examine witnesses.
Fifth, Dr. Holick complains that the Board of Trustees did not accept the final recommendation by the Medical Executive Committee to suspend Holick’s clinical privileges for ninth months, and instead decided on its own to terminate his privileges. That is not a breach of contract, however. The Bylaws expressly provide (in art. VII, § 1.1) that if the MEC makes a recommendation adverse to a medical staff member, and the member decides to seek “appellate review” by the Trustees, then the Trustees shall make the “final decision on the matter.” Nothing in the Bylaws bars the Trustees from opting to impose a more severe sanction than the MEC recommends. Though Dr. Holick asserts that “the Trustees’ task was to ratify or reject the MEC’s recommendation,” he cites no provision of the Bylaws that limits the Trustees’ discretion in that manner.
In any case, even if Dr. Holick had presented evidence sufficient to support a finding that Defendants breached his contractual rights during the 2020–2021 hearing process and through the Trustees’ subsequent vote to terminate his privilege, which he has not, Defendants would still be entitled to summary judgment on this aspect of Dr. Holick’s claim for breach of contract because
 
                                                            -17-
 
there is no evidence that Dr. Holick suffered any economic harm as a result. See Ayash, 443 Mass. at 388.
It is undisputed that Dr. Holick accepted an offer of a paid professorship at BUMS that started on the day that his staff appointment and privileges at BMC were terminated by the Trustees, at a salary of $230,000 per year. Dr. Holick presents no evidence showing that being forced to switch his status from being an employee of Evans to being an employee of BUMS caused Holick to suffer any compensable economic injury.
4. Violation of Public Policy Claim. Count III of the complaint asserts that Dr. Holick’s employment with Evans was wrongfully terminated in violation of public policy. The record establishes that Dr. Holick will not be able to prove all elements of this claim. Defendants are therefore entitled to summary judgment in their favor on this claim. See generally Roman, 461 Mass. at 711.
Dr. Holick was employed at will and therefore in theory can assert this claim. Under Massachusetts law, only at-will employees can sue for wrongful termination in violation of public policy. See Willitts v. Roman Catholic Archbishop of Boston, 411 Mass. 202, 209 (1991) (“The common law doctrine granting an employee a cause of action for wrongful discharge, if the reason for the discharge is contrary to public policy, is limited to at-will employees.”). BMC’s assertion that Dr. Holick was not employed at will, because Evans’ Physician Practice Agreement provides that Dr. Holick could be fired only under certain conditions, is without merit. In addition to permitting immediate termination in some circumstances, the PPA provides in § 7.d that Dr. Holick could also be fired “for any reason” on ninety days’ notice. “[A] contract that ‘reserve[s] to the parties an explicit power to terminate the contract without cause on written notice’ is a ‘a classic terminable at will employment contract.’ ” G.M. Abodeely Ins. Agency, Inc. v. Commerce Ins. Co., 41 Mass. App. Ct. 274, 278 (1996), quoting Fortune v. The National Cash Register Co., 373 Mass. 96, 101 (1977). Dr. Holick was therefore employed at-will.
But Dr. Holick has not been able to muster any evidence that he was fired in violation of public policy, which is an essential element of this cause of action. Defendants are therefore entitled to summary judgment in their favor on this claim. See Kourouvacilis, 410 Mass. at 715.
Redress is available on the theory that an at-will employee was fired in violation of public policy only if their employment was “terminated for
 
                                                            -18-
 
asserting a legally guaranteed right (e.g., filing workers’ compensation claim), for doing what the law requires (e.g., serving on a jury), … for refusing to do that which the law forbids (e.g., committing perjury),” or for doing things that are expressly encouraged by statute such as cooperating with a law enforcement investigation. Wright v.  Shriners  Hosp.  for  Crippled  Children,  412 Mass. 469, 472–473 (1992), quoting Smith-Pfeffer v. Superintendent of Fernald State Sch., 404 Mass. 145, 149–150 (1989).
This public policy exception to an employer’s right to fire at-will employees without cause must be construed and applied “narrowly,” because “to do otherwise would ‘convert the general rule” that an employee-at-will can be fired at any time and without any reason “into a rule that requires just cause to terminate an at-will employee.’ “King v. Driscoll, 418 Mass. 576, 582 (1994), quoting Smith-Pfeffer, 404 Mass. at 150.
There is no evidence to support Dr. Holick’s invocation of the statute that makes it unlawful for hospitals to “enter into a contract or agreement” that would prohibit a physician from testifying in an administrative or judicial hearing or that would limit their ability to do so. See G.L. c. 111, § 53H.        Dr. Holick does not claim or point to any evidence suggesting that BMC or Evans ever entered into such a contract or agreement with him. Nor is there any evidence that BMC or Evans instructed Dr. Holick that he could not testify as an expert (or otherwise), or did anything else to prohibit him from doing so. Instead, Dr. Holick argues that BMC’s actions “were spurred by a desire to prevent Dr. Holick from making observations that he would then share in legal proceedings.” Assuming that the record evidence would support such an inference, that would still not support any finding that BMC violated § 53H.
Dr. Holick has not mustered any other evidence that BMC terminated his employment in retaliation for asserting or exercising any legally guaranteed right, because Dr. Holick did anything that he was legally required to do, or because Dr. Holick refused to do something that is legally forbidden. Defendants are therefore entitled to summary judgment on this claim.
Allegedly firing Dr. Holick because he criticized other BMC physicians does not constitute wrongful termination in violation of public policy as a matter of law. See Wright, 412 Mass. at 472 (firing employee in retaliation for having criticized hospital employer to outside reviewers did not violate public policy); Smith-Pfeffer, 404 Mass. at 149–150 (firing employee because she signed letter highly critical of superintendent of state school for developmentally disabled
 
                                                            -19-
 
clients and opposed his reorganization plan did not constitute discharge in violation of public policy).
Similarly, if Dr. Holick were fired because he disagreed with internal BMC practices or procedures, as he also seems to allege, that would not violate public policy either. “[T]he internal administration, policy, functioning, and other matters of an organization cannot be the basis for a public policy exception to the general rule that at-will employees are terminable at any time with or without cause.” King, 418 Mass. at 583. Nor does Dr. Holick allege that he was fired for making internal reports of criminal conduct. Contrast Shea v. Emmanuel College, 425 Mass. 761, 762 (1997).
ORDER
Defendants’ motion for summary judgment is allowed. Final judgment shall enter in favor of the Defendants on all claims.